AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

FILED
CLERK, U.S. DISTRICT COURT

12/18/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____1V_____ DEPUTY

United States of America

v.

Luis Ray Juarez-Ortiz,

Defendant.

Case No. 2:25-mj-07887-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, Colton Freemantle, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of December 14, 2025, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 111(a)(1), (b) | Assault on a Person Assisting Federal Officers |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Colton Freemantle, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 12/18/2025

*[signature: Patricia Donahue]*
Judge's signature

City and state: Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSA: Aylin Kuzucan x8603

**AFFIDAVIT**

I, COLTON FREEMANTLE, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with Homeland Security Investigations ("HSI"), assigned to HSI Los Angeles, and have been so employed since December 2024. In the course of my duties, I am responsible for investigating federal crimes including but not limited to child exploitation, child pornography, cybercrimes, immigration crimes, human rights violations, human smuggling, smuggling of narcotics, weapons, and other types of contraband, financial crimes, and various other violations of immigration and customs laws. Through my training, I have learned of HSI's criminal investigative authority, as well as investigative techniques. I am currently assigned to the HSI Integrated Operations Group Task Force ("Task Force"). As part of this Task Force, I investigate various immigration crimes with Department of Homeland Security ("DHS") agents and analysts, including from HSI and Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations. As a result of my collaboration with these DHS employees on this Task Force, I am familiar with the investigation of crimes committed against federal employees, and have participated in the investigation of several assaults, threats, or injuries.

2. Prior to joining HSI, I served for six years in the U.S. Army National Guard as a human intelligence collector,

interrogator, source handler, and Russian linguist. Following my military service, I worked for approximately one year as a contracted intelligence analyst for the Department of Homeland Security. In that role, I specialized in domestic violent extremism, authoring analytical products on violent extremist activities and screening suspicious activity reports for indicia of violent extremist radicalization and mobilization.

3. I have completed over 1,000 hours of training at the Federal Law Enforcement Training Center in Glynco, Georgia, where I received comprehensive instruction in criminal investigations, including investigation techniques, service of legal process, determining fact in interviews, analytical processes, and gathering and preserving evidence. During this training, I completed over 100 hours of legal instruction, including extensive training in Title 18 of the United States Code. Additionally, I have completed over 1,600 hours of training in human intelligence collection with the Department of Defense, covering interviewing, elicitation, debriefing, handling confidential sources, and interrogation.

## II. **PURPOSE OF AFFIDAVIT**

4. This affidavit is made in support of a criminal complaint against, and arrest warrant for, LUIS RAY JUAREZ-ORTIZ ("JUAREZ-ORTIZ") for a violation of 18 U.S.C. §§ 111(a)(1), (b) (Assault on a Person Assisting Federal Officers).

5. This affidavit is also made in support of applications for warrants to search the following:

  a. The premises located at 44139 2nd St E, Lancaster, California ("CA") 93535 (the "SUBJECT RESIDENCE") as described further in Attachment A-1;

  b. A Black Chevrolet Silverado 1500 Z71 truck bearing California license plate 98884E3 (the "SUBJECT VEHICLE") as described further in Attachment A-2; and

  c. The person of Luis Ray JUAREZ-ORTIZ and items in his control at the time of his arrest as described in Attachment A-3.

  6. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 111(a)(1), (b) (Assault on a Federal Officer) (the "Subject Offense"), as described more fully in Attachment B. Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

  7. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, search warrants and arrest warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

8. On or about December 14, 2025, HSI Los Angeles received information from the ICE Field Coordination Center, indicating that two federally contracted Officers, contracted through G4S, ("G4S Officers"), completing contracted duties for ICE, were held at gunpoint by JUAREZ-ORTIZ while sitting in their car in a parking lot in Lancaster, CA. JUAREZ-ORTIZ pointed a handgun at the two G4S Officers sitting in the driver's seat and demanded to know where the officers had taken "her" – two other G4S officers had assisted with transporting a female arrestee earlier that day. Accordingly, there is probable cause that JUAREZ-ORTIZ committed an assault on a person assisting federal officers in violation of 18 U.S.C. §§ 111(a)(1), (b) on December 14, 2025.

### IV. STATEMENT OF PROBABLE CAUSE

9. Based on my discussions with witnesses, conversations with other law enforcement agents, review of video footage and my own involvement in the investigation, I am aware of the following:

#### A. IMMIGRATION ARREST

10. On the morning of December 14, 2025, ICE officers conducting targeted enforcement activities arrested a female subject who departed the SUBJECT RESIDENCE. Following the arrest, G4S Officers took physical custody of the female subject in order to transport her to Los Angeles for further processing. Information provided by the ICE Field Coordination Center

indicated that only one female had been arrested by ICE in Lancaster, California, on December 14, 2025.

### B. ASSAULT ON G4S OFFICERS

11. At approximately 1:30 p.m., G4S Officers parked their official transport van facing south in the lot behind Cinemark Theaters, located at 2600 W Ave I, Lancaster, CA 93535. Shortly thereafter, a Black Chevrolet Silverado Z71 pickup truck, (believed to be the SUBJECT VEHICLE) drove towards the van from behind, traveling past the driver's side of the transport van, turning and parking nearly perpendicular to the van; as if to block the van's path of travel.

12. As the SUBJECT VEHICLE approached, the G4S Officer in the driver's seat saw that the front passenger window of the car was down, and a person in the front passenger seat was holding up a cellphone and appeared to be filming. Before either G4S Officer could react, both the passenger and the driver exited the SUBJECT VEHICLE and approached the van. The driver, later identified as JUAREZ-ORTIZ, approached the front hood of the van, raised a handgun in his right hand, placing his finger on the trigger, and pointed it at the G4S Officer in the driver's seat of the van. JUAREZ-ORTIZ pointed the handgun at the G4S Officer throughout the duration of the encounter.

13. JUAREZ-ORTIZ, shouting, demanded to know where they'd taken, "her". The G4S Officers understood the driver's reference to "her" as referring to the female whom ICE had arrested that morning. The G4S officers described the driver as

being furious, and individually stated that the driver made statements during their interaction such as:

       a.   "Stop! Let her out."

       b.   "I'm going to shoot you."

       c.   "Where did you take her?"

       d.   "Where is she at?"

       e.   "Don't come back or I'll kill you."

14. The G4S Officers, attempting to deescalate the situation, answered JUAREZ-ORTIZ's questions and informed him that the female arrestee from earlier that day was not in the van. The female passenger continued to hold her phone up as if filming, standing at the driver's side window of the van. After a short time, the G4S Officers convinced JUAREZ-ORTIZ and the female passenger that they did not have "her" and explained that the female ICE arrestee from that morning had been taken to Los Angeles in a different van. The driver, still aiming the handgun at the G4S Officer, then told them to "Get the fuck out of here." The G4S Officers quickly drove away. At about this time, the G4S Officers observed the driver and passenger returning to the SUBJECT VEHICLE.

       C.      **IDENTIFICATION OF JUAREZ-ORTIZ**

15. Following receipt of this information, the Task Force obtained a list of vehicles registered in government databases to the SUBJECT RESIDENCE. From this information, the Task Force learned that the SUBJECT VEHICLE is registered to JUAREZ-ORTIZ. Queries into government databases revealed photos of the SUBJECT VEHICLE, which is black and bears a red Chevrolet Z71 logo on

the rear panels.  The SUBJECT VEHICLE has been photographed parked on 2nd St E, adjacent to the SUBJECT RESIDENCE, four times since October 2, 2025.  From this search, the Task Force was able to pull a copy of a driver's license associated with the SUBJECT VEHICLE, and name on the driver's license matched JUAREZ-ORTIZ, the photograph on the driver's license depicts a man with brown hair, light skin tone, and includes his weight of 170 pounds, height of 5 feet 10 inches, and age of approximately 25 years.

    16.  On December 16, 2025, I conducted individual interviews with both G4S Officers involved in the incident.  The G4S Officer in the driver's seat stated that as the SUBJECT VEHICLE approached, they observed the red Z71 logo on the rear panel of the vehicle.  In a separate interview, the G4S Officer in the passenger seat made a similar statement, emphasizing how the Z71 logo stood out to them during their first observation of the truck. The G4S Officer sitting in the passenger seat of the van described the driver who was holding the gun as a light-skinned male in his late 20's, with medium build, no facial hair, and short straight hair.

    17.  Following the G4S Officer's description of the driver, I presented the G4S Officer who was in the van's passenger seat during the incident with a photo lineup of six individuals, with one being an image of JUAREZ-ORTIZ from his driver's license, and the other images being males of similar age and appearance to JUAREZ-ORTIZ.  I asked the G4S Officer to review the photos and indicate if any of the individuals seemed familiar.  Almost

immediately and without prompting, the G4S Officer indicated that they recognized the person known to the Task Force to be JUAREZ-ORTIZ. After considering for a moment longer, the Officer reiterated their choice, stating, "I remember the face."

### D. SUBJECT VEHICLE and SUBJECT RESIDENCE ARE DIRECTLY LINKED TO THE INCIDENT

18. On December 17, 2025, I spoke with an ICE Officer who had been present during the December 14, 2025, arrest of the female who was observed departing from the SUBJECT RESIDENCE. When shown a photo of JUAREZ-ORTIZ (the same photo identified by the G4S Officer in the photo lineup), the ICE Officer stated that on December 14, 2025, he observed JUAREZ-ORTIZ leave the SUBJECT RESIDENCE wearing all black with a backpack, enter a black pickup truck, and drive away. The Officer provided a photo he had taken of the truck JUAREZ-ORTIZ departed in, which depicted the SUBJECT VEHICLE, and the photo was time stamped at 9:46 a.m. on December 14, 2025, and geolocated on 2nd St E in Lancaster, CA.

19. On December 17, 2025, the Task Force obtained additional images and video of the SUBJECT VEHICLE taken on December 14, 2025. The images depict the following:

   a. On December 14, 2025, at 1:33:50 p.m. PST, the SUBJECT VEHICLE was photographed by a license plate camera located near the intersection of W Ave I and 20th St W in Lancaster, CA. In the photo, the SUBJECT VEHICLE is traveling westbound on W Avenue I in Lancaster, CA 93536, toward the

Cinemark theater where the incident with the G4S Officers occurred.

   b. On December 14, 2025, at approximately 1:34 p.m., a black pickup truck resembling the SUBJECT VEHICLE (but without visible license plates) is captured on video by a traffic camera, which is facing west at the intersection of Avenue I and Valley Central Way in Lancaster, CA.  The video depicts this black pickup truck travel westbound on W Avenue I, before turning left into a parking lot at the Cinemark theater at 1:34 p.m.

   c. On December 14, 2025, at 1:39:36 p.m. PST, the SUBJECT VEHICLE was photographed by a license plate camera located at the intersection of W Lancaster Blvd and Valley Central Way.  When photographed in this location, the SUBJECT VEHICLE is traveling south on Valley Central Way, away from the Cinemark theater where the incident occurred with the G4S Officers.

### V. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

20. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the

hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading

filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    21.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

        b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    22.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of publicly available materials:

      a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

      c.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress JUAREZ-ORTIZ's's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of JUAREZ-

ORTIZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VI. REQUEST FOR NIGHT SERVICE OF WARRANTS

23. Based on my training and experience and the facts of this case, I believe that the safest time to execute the requested warrants is between the hours of 10:00 p.m. and 6:00 a.m. Given the events of December 14, 2025 described above, I believe it is unlikely that JUAREZ-ORTIZ appreciated that the G4S Officers were merely assisting federal officers. Instead, JUAREZ-ORTIZ believed the G4S officers were in fact federal law enforcement officers with Immigration and Customs Enforcement. JUAREZ-ORTIZ's willingness to brandish a gun at someone who he likely believed was a federal law enforcement officer leads me to believe that JUAREZ-ORTIZ is both armed and dangerous, particularly in a situation involving the execution of warrants by federal law enforcement officers. Therefore, I request night service authorization in order to allow federal law enforcement to execute the requested warrants at the safest possible time.
//
//

## VII. CONCLUSION

24. For all the reasons described above, there is probable cause to believe that JUAREZ-ORTIZ committed a violation of 18 U.S.C. §§ 111(a)(1), (b) (Assault on a Person Assisting a Federal Officer) and that the items described in Attachment B will be found in the locations described in Attachments A-1, A-2, and A-3.

/s/
COLTON FREEMANTLE, Special Agent Homeland Security Investigations

Subscribed to and sworn before me this  18th day of December, 2025.

HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE